We have essentially three primary reasons why we believe the district court opinion should be reversed. The first reason is that the district court improperly acted as the trier of fact in this situation resolving key questions of disputed issues of fact in favor of the defendants in reaching their ruling. The second reason is that the district court improperly failed to acknowledge and credit certain key facts cited by Plaintiff Marta in reaching its ruling. And third is that we believe that the practical effect of the court's decision undermines the longstanding antitrust policy which is designed, which is followed not just by the plaintiff, which vests standing in the direct purchaser, the first entity who is furthest upstream rather than resting standing in multiple other purchasers further downstream. It's our position that Marta was not a mere agent for antitrust standing purposes. And from our perspective, the bottom line, the key, the two most key, key facts from our perspective were Marta's control over price and Marta's control over product selection. We would submit to this court that when you think about what is a purchase and what is a purchaser, there are no two more important facts than what is the price that is being offered for that product and what is the actual product that's being offered. In this case, Marta exclusively negotiated with the defendants to determine both of those things. So from your perspective, all we would need in order to hold in your favor is that there's a genuine issue of material fact as to whether Marta was a buyer or a mere purchasing agent. Yes. Yes. I think at the end of the day, our position here is that this is a very narrow argument I'm making, which is this is inappropriate for summary judgment. There's tons of disputed facts. And if we were to agree with you on that, would we have to reach any of the other questions in the case, as it is now before us on appeal? No. No. It's the only question. And from our perspective, when you look at and admittedly this is a common Do I have to read? Let me stop you on that just a minute, because that was something I was thinking about, so I'm glad that Judge Graber asked you. So if I determine that you have standing as a principal rather than an agent, I don't need to determine that you also have antitrust standing? No, you do. That, first of all, from our perspective That would give you antitrust standing if you're a purchaser. Correct. If we're a purchaser, if we are the direct That's what I'm trying to make sure I understand. You're saying that if you are, in fact, a principal or a purchaser, direct purchaser, you will have the antitrust standing you need? Correct. We would be the first purchaser. That's what I understood. OK. So if we were to go through the facts, I mentioned product selection. And our briefs are very detailed as far as the factual sites of the record. But what you'll see is that MARTA was solely responsible for negotiating the programs with the defendants. And what the programs would be would be a negotiation in which they would select which of the defendants' product array MARTA would offer to its members. And also which of the various rebates and discount programs it would offer to its members. So as far as product selection, MARTA is exclusively interacting with the different manufacturers, in this case the defendants, to determine which of these products it's going to offer to its members. And then the negotiation would turn to price. And MARTA would be exclusively responsible for negotiating price two ways, both the negotiation of all the pricing with the defendants. That would be then MARTA would exclusively set the pricing to its members. So MARTA was in control of the price both from the defendant and also to its members. And importantly, the pricing that MARTA set to its members was not formulaic in any way. It was MARTA would use its discretion because it wanted to emphasize, incentivize sales of certain products over others. They were called the products they wanted to incentivize. I'm sorry. Go ahead. I was just going to say there's some argument in the opposing briefing suggesting that MARTA's non-profit status makes a difference in the analysis of whether it is a purchaser or mere purchasing agent. Does it make any difference in your view? No, I don't think it makes any difference whatsoever. The antitrust laws are very clear. It's the first purchaser outside of the conspiracy, the direct purchaser. It doesn't matter whether it's a non-profit or not a non-profit. Or whether it resells or whatever it might do. Correct, because that's... But it seems to me that your opposition, which leads me to the same area, seems to me your opposition is saying, okay, you are responsible for selecting what products are available. Okay, you are responsible for negotiating the prices and other terms with the vendors. And the executive director makes the decisions. But all of those who are the responsible parties are on your board and they help you make all those decisions. So therefore, what you're doing is just carrying out what these responsible principles tell you to do. So that's actually directly contradicted in the record. That's the defendant's, certainly their argument. What... This is the facts that we cite and I'll cite them to you and I can read a little quote to it. But from our perspective, what the facts show is the following, that the members do sit on member committees. And they are allowed to provide non-binding suggestions and input to the executive director. However, MARTA has over 100 members. They all have different views, different priorities. So it is down to the executive director to make decisions as to which products to buy, which products to make core models. I guess my worry about that is it seems to be very limited thus far, that we're only to that point. I mean, what is your responsibility for the decision you make? I mean, they have very good arguments that you're just doing what the principles tell you to do. The best argument, and that's where I'm leading you, so what if you negotiate those? And so what if you choose the product? Who bears the responsibility for your decision? Well, first of all, what I would say, I would want to refocus us just for a minute back to what did the antitrust law say? What our task here today is to determine, who is the direct purchaser? Whoever is the direct purchaser has standing, regardless of whether the overcharge is 100% passed on all the way down. So as far as the effect of MARTA's decisions on which products it's purchasing and which price, what effect that has downstream is an irrelevancy for the antitrust laws. But what I would say is, MARTA is not, the membership is not this unified body. If you take a look in the record, ER 86, MARTA's principal, Bob Thompson, this is a direct quote, talking about this process, he said, I had to process all of this information to make a judgment on what I felt the best direction to go. And you're not going to please everybody. You also had the vendor that you had to satisfy, because if you created too much demand on a model, the vendor might not be able to provide you the amount of supply to our members. So it was a balancing act. But the director was in the middle and had to make the final call. So, yes, the members had input. Yes, if MARTA consistently did things that was against the wishes of every single member, sure, it would have a problem. But that wasn't the case. They had to use their judgment, take in all the input, and make the decisions that what they thought were the best products to buy for its membership as a whole and at which prices. Well, presumably, that would be true even if it weren't a membership. In other words, if it were a unified corporation, the CEO might get different advice from six different departments and still have to make a purchasing decision. So I guess I'm not sure of the relevance of getting advice. At the end of the day, what we're looking at here, you're trying to decide whether it's MARTA, the purchaser, or are they just a sort of passive intermediary in the process that you just skip over? You know, we understand. Basically, you look at the antitrust law and say, okay, well, MARTA's the first person in line. Should we skip over them? Are they really just a passive intermediary, a sort of a non-entity in the chain as the agent just doing what the members say it all the time? And what I would submit is what the record is showing is that, yes, MARTA listened to its members. Of course it did. But MARTA made its own decisions and made decisions on which models were core models. And there was a lot of dispute, and it's extensively in the record. I can cite it to you, but it's in our briefs. But this whole notion of which products were core models. Core models were products that they gave more of a discount to, to try to push those sales through. The members had very different views. Some members wanted, you know, a certain manufacturer's products to be more incentivized than others. And MARTA had to make its own decisions on that. So all the decisions on pricing. Well, I appreciate where you're going, and I appreciate all of this. The reason I'm pushing you just a little bit. I remember when I was a purchasing agent for Simplot. I made all the decisions as to what property to purchase. I made all the decisions as to what I should do in that purchasing. But I wasn't responsible, Simplot was responsible. I was doing it all for Simplot. Nobody knew I was for Simplot. I was just out there on the edge. I was out there on the front. I'm trying to figure out why it's so different for you than what I was doing. So I don't think I'd have antitrust liability here. So yet on the other hand, I think Simplot would. So again, I'm trying to push you a little bit as to what we have here. Because though you're making arguments about what you did or what you didn't do, those an agent could do. You've got to show me there's somehow a principle. Well, it's a purchaser from our perspective. I don't think we have to show that we are a principal. But we are the entity in the chain who is the first purchaser. And if you look at all the facts that are relevant to a purchaser. Did you pay money? We did. And let me just hit on something. I mean, that's the reason I'm trying to get you to move you a little bit. I want to get to the financial responsibility, because you hit on that. And that's another very disputed issue of fact. So what the record shows from our perspective, and then I'll tell you what the defendants say. From our perspective, we have ultimate financial responsibility. We pay the defendant, the manufacturer. When one of our members orders a product, it gets shipped to the member. We pay the defendant. And the member pays us. The defendants take the position, well, that's just a ministerial act. You're totally protected because you have letters of credit that protects you. Well, that's not true at all. And in fact, in the record, it shows that there were several circumstances where we made a payment. Our member went out of business. Their letter of credit was not sufficient. We cite these in the record. And we were ultimately the party responsible for those products. And we actually had to go to the member, pick up the products, and take possession of them and basically sell them on our own. But the point is, is that ultimate financial responsibility lied with us. You have to remember, the members have no interaction with the defendants at all. Counsel, you're down to two minutes if you'd like to have any rebuttal time. I will do that. Thank you. May it please the Court, Lucius Lau on behalf of the Appellees. Your Honors, antitrust standing is a question of law. And in reaching this legal conclusion that Marta lacks antitrust standing, Judge Targert didn't weigh this. But, counsel, the question of whether someone is or is not a purchaser or a buyer is a factual question. The legal standard is, if you are a purchaser, you have standing. If you are not a purchaser, you don't. So we know the legal principle. But the factual question, it seems to me, is whether there are inferences that would permit a trier of fact to determine that Marta is, in fact, the buyer. And that seems to me to be entirely a factual question. Not based on the factual record before us, Your Honor. Let me explain why. The test that my colleague, Mr. Iovino, just said about why he believes that Marta is a purchaser in terms of negotiating the price and selecting the products. In Marta's brief, Marta set forth a different test. Marta set forth the correct test at page 28 of its brief, where it stated that a buyer will always determine whether to purchase, when to purchase, what to purchase, and how much to purchase. Okay, but let me just make sure I understand your position. You don't dispute that a buyer does have antitrust standing. I mean, if it were just the XYZ company that the CEO walked in and said, I want 20 of those, they'd be a buyer and they'd have standing, correct? The direct purchaser per Hanover Shoe and Illinois Brick clearly has standing. So then we are looking at the question whether there are issues of fact in this record that would permit an inference to be drawn, a reasonable inference to be drawn, that Marta is a purchaser. We don't have to, I mean, for our purposes on appeal, we don't have to decide for sure if there's an issue of fact. It just goes back, correct? Well, this Judge Tiger ruled on summary judgment. This Court will review his decision de novo. Right, so are there issues of fact? And if not, why not? They are not, because all of the material facts of this case, Your Honor, they all support the conclusion that Marta is a non-exclusive purchasing agent. What Marta itself said it was in its governing corporate documents. That is in its corporate documents. Now, let's look at this governing corporate documents. Yes, Your Honor. In Marta's cooperative plan and its articles of incorporation, reading through those, it says Marta shall make sales to shareholders of a wholesale nature and shall not engage in retail sales. Doesn't that show that Marta is the purchaser then selling those back to the companies that are their members? I appreciate the question, Your Honor. The Marta that's referenced in those articles of incorporation is not the Marta we have before us. This Marta is Marta Cooperative of America, Inc. I understand. The articles of incorporation, 1965 articles of incorporation concerning Marta North Central Cooperative Incorporated, a for-profit entity. So that was a predecessor corporation. Since 1965, Marta has gone over some sort of reorganization. So the pertinent documents to look at are the cooperative plan. We have two versions in the record, the 1998 cooperative plan and the 2006 cooperative plan. Both of those documents plainly state that Marta is a non-exclusive purchasing agent. Well, let's look at the on-the-ground facts. As I understand it, there is evidence in the record that Marta owned the products when they paid to Sheba, and they owned them until the members paid Marta in turn, and that there are some instances, as counsel was describing, in which Marta was obliged to pay even if the members were unable to and did not, and thus assumed the risk of loss. There was, and I acknowledge, a statement made by Mr. Thompson, Marta's executive director, also the Marta 3DB6 witness, where he said, well, Marta really was the owner until the members paid. There's one sentence to that effect. Well, for summary judgment, isn't that all we need? Not for conclusions. And I would suggest to you, Your Honor, that the question of ownership is more of a legal conclusion, not a factual conclusion. Look more to what Mr. Thompson said as the 3DB6 witness in terms of what Marta was doing in order to protect its interests. At page 75 of the record, Mr. Thompson acknowledged that Marta would uniformly, as an expected practice, issue UCC Form 1s. Who issues UCC Form 1s? Creditors who are trying to perfect their security interest in collateral. And is there not record evidence that in some instances Marta ended up having to pay when one of its members did not or could not? Yes, Your Honor, but that's, this is in Marta's capacity as providing financial services. Well, that's your argument, but isn't it also a permissible inference that they bought the products and then had to resell them and bore the risk of loss if they were unable to resell them? Maybe if you were looking at Mr. Thompson's sentence in isolation, but if you considered his testimony as a whole, particularly this reference to the issuance of UCC Form 1s as an expected practice, then I don't think that Marta's claim that it ever owned the merchandise is tenable. It's just not credible. It's belied by the reference to UCC Form 1s. Well, what we're trying to figure out is, is there a question of fact? So I appreciate Judge Graber's question. Let's go on further. Seems to me that Marta purchases the product and then Marta resells the product. Is that true? No, Your Honor, it is not. Well, let me, is the price that Marta sells the product or the price that the ultimate person who receives the product pays to Marta for the product, is that more than the product Marta pays to the person from whom the product is bought? What Marta was doing, or part of what Marta was doing, was negotiating price lists. I understand that. What purchasing agents regularly do. And then Marta, after negotiating that, there was a purchase made, but who ultimately gets the product, pays more to Marta for those goods than what has been the negotiated price, as I understand it. And they add a little extra. They determine the price to resell the product. There was no resale, Your Honor. I understand your argument there's no resale, but why does the owner, or the one who ultimately gets the product, pay more for it than the price that Marta negotiates? The core model discounts, and this is definitely worth a minute of our time. Yes, that's what I want you to talk about. Okay, first, in terms of how was Marta being compensated, there was a 2% ad valorem fee that Judge Tucker correctly recognized as, it looks very much like a commission. And on page 10 of the supplemental record, the Marta 30B6 witness said that this was a formula to which there were no exceptions. So that's how Marta was being compensated, the 2% ad valorem fee. Separate from that, there was this concept of a round up or hold back. So for every purchase made by a Marta member, say it was at $199.50. Marta would charge the member up to the next dollar, $200, maybe 201. But Mr. Thompson said generally round up to the next dollar. This round up money would then go into what's called the merchandise budget. And from this merchandise budget, Marta would fund the core model discounts. Those products that Marta really wanted to promote among the membership. So there may have been minor variations in terms of the price actually paid. That doesn't distinguish, it seems to me, from any wholesaler who buys products and pushes certain ones to its customers. So I'm not sure really why that makes them, in your view, by definition a non-purchaser. The money received by Toshiba, the $199.50 in your example, was paid by Marta, correct? Yes. Okay. So actually, no, it would be- At least in some instances. It would be on the account that the 2%, there was the 2% ad valorem fee that Marta would take first. My point being, the money went from Marta to Toshiba, right? It didn't go from XYZ to Toshiba, it went from Marta, correct? Yes. And so Marta technically took title to the property at that time. There's no indication in the record that Marta ever took title, Your Honor. So I have to disagree with your- Who did? Is there evidence to the contrary? Well, there's evidence that the members issued purchase orders directly to the vendors. And there's evidence, consistent evidence, that the vendors would ship the merchandise directly to the members. Marta never had inventory of its own other than for some small inks of contact. I was going to say, I thought there was evidence that in some situations they did hold inventory. Am I wrong about that? Only with respect to the very early part of the period. Our period is 1995 to 2007. During the early part of the period, ending in 1995 or 1996. In some instances, Marta would hold inventory, not for its own convenience, but for the convenience of its members. It was another service provided for Marta's members. And of that small inventory, 95% of it was appliances, only 5% electronics. But putting the numbers aside, it was strictly done as with everything else that Marta did. Marta provided services, we acknowledge that, in order to help the members out. That's part of Marta's mission statement. Marta's mission statement, and this is page 60 of the record, is clear. Marta states that it provides services that enhance the buying and selling of goods. Those are Marta's own words. Those aren't mine. That mission statement is consistent with what a purchasing agent does. A purchasing agent does not act for its own benefit. A purchasing agent acts for the benefit of its principal. So what Marta has done here, everything that Marta has done from the negotiation of the price lists, to the administration of central billing, to the provision of the ancillary services, all of these services were done to help out the members, that is to say, to help out Marta's principal. So there are no disputed material facts in this case, Your Honor, because everything that Marta did was for the benefit of its members, even for the selection of the products. Mr. Thompson was very clear that he would never select a program that was contrary to the membership. That doesn't sound like the words of a wholesaler. That sounds very much like the words of a purchasing agent. Always looking out for the principal, always looking out for the boss. So there's no need to send this case back to Judge Tiger or to anywhere else because the record is clear. That Marta, consistent with its statement in its governing documents, in the cooperative plan, that it shall act as a non-exclusive purchasing agent. It's there and Marta at all times remained true to its corporate mission. That is to say, to act as a purchasing agent. One thought about that cooperative plan. That document was created in the ordinary course of business. That document was created for non-litigation purposes. I'm not saying that that label should be determinative or conclusive. I'm not. What I am saying is that it is significant and the court should view with skepticism, great skepticism, any effort by Marta to disavow that statement, that it is a purchasing agent. I guess I understand your argument. But what we're really looking at is whether there's any material issue of fact about this particular determination. It seems to me that a cooperative plan is some information that makes it what it is. But what we're looking at, are there any material facts that are contrary? That's why we're asking you the questions. These are fair questions. I appreciate that, Your Honor. I mean, if in fact you could say these people, all they got was they got a list of the products they could buy. And then they did all the buying and all the product went to them. And there was never anything that Marta did in the process. That would be easy. But in this particular instance, that's why we're asking you the questions. It seems as if Marta pays for the product. The individual members, if you will, reimburse Marta to say it as best you can. But give Marta extra than what Marta pays. And Marta is responsible if one does not repay them. Yes, Your Honor. But the fact that Marta pays, that goes to central billing. There is an element of financing that's going on here. Central billing was created so that the vendors would have one convenient place to send all of the invoices. And the vendors would have assurances that they would get paid. Well, it just is easy for the vendors to have the payment come directly to those who are, in your mind, the direct purchasers. But the fact that it goes to Marta, all we're trying to determine is, is that enough of a genuine issue of fact for which one ought to take the whole evidence, hear from all of those people who are involved in the, if you will, the project, and then make that determination. Or can we make it on what we have in front of us? That's all we're trying to do. And certainly make the determination based on what's in front of you. Let's say for these, for central billing, this was a service not done by Marta. Let's say that a bank or other entity was providing this short-term financing. Would the court feel that, oh, the bank is somehow a direct purchaser or an entity that deserves standing? It could be. It could be, depending on the circumstances. It would be hard to imagine those circumstances, Your Honor. Again, in light of Hanover Shoe and Illinois Brick, the direct purchaser rule has great meaning. There are limited exceptions to that rule. Right. And all we're trying to decide here is whether there's an issue of fact as to who is the direct purchaser. We all agree that that's the rule. It's just a matter of how it applies to this situation. When going back to the rule, and I agree, this is in terms of determining who the direct purchaser. A very important part of this case. I mentioned earlier Marta's acknowledgment that whether, when, what, and how much, that defines who a purchaser is, 28 of their brief. Look at page 35 of their brief where Marta acknowledges that the members, the members decided whether to purchase, when to purchase, what to purchase, and how much to purchase. The members are the purchasers. Did Marta itself ever decide whether to purchase? No. When to purchase? No. What to purchase? How much to purchase? Again, no and no and no. What? Yes. Pardon me, Your Honor? What? Yes. Marta did determine what to purchase. What Marta determined was? Marta, Marta not only selected what products were available, but Marta selected what would be the price. Available, that's the key, Your Honor. But I'm just saying, when we go to what, Marta has a point to make. Nobody except Marta was determining what products were to be purchased and what the price of those products was. No one determined that but Marta. But the members themselves. Remember, this was a non-exclusive arrangement. The members could look at the Marta price sheet and say, yes, that sounds like a good idea to me. I would like to buy 100 units of that particular Toshiba sized, Toshiba television based on the price I see on the price list. Or the members could decide, I wish to purchase my televisions. On my own. Correct. So in other words, Marta has TVs to sell me. I can purchase them at that price, or I can go get them on my own and purchase them there. So in that instance, they are repurchasing from Marta. No, it's an offer to sale. It's what purchasing agents do on a regular basis, like the group purchasing organization in Larazepam, Premier. It's trying to gather up the collective purchasing power of its members. But just like in that case, there was no suggestion that Premier, the buying organization, should be the direct purchaser. And no suggestion that Premier was acting as a wholesaler. Counsel, you've well exceeded your time and I think we understand your position. No, it's no problem. Not your problem. It was ours. We took it. May it please the court, I'm not going to go over anything that's already. I just want to make two quick points and then see if the court has any further questions. Essentially, our main position is there's tons of questions of fact here on a lot of really critical issues as to who is the purchaser. But let me just highlight two, because it just came out of that colloquy. You had a colloquy with my adversary on financial responsibility. If you go to the record at ER 166, this is Amy Field. Now, my adversary cited one sentence from Bob Thompson and said that wasn't enough. This is a transcript of another MARTA employee who's talking about the financial responsibility point. Question, you gave me a second example of when the goal of MARTA as expressed in this cooperative plan might not have been met. And you said that would be an issue where a company went out of business and could not buy the merchandise they had committed to. Do you remember giving me that example? Answer, yes. And what would happen in that circumstance? Answer, we would be responsible to pay the manufacturer even though we were not being paid. And that one sticks out. Maybe two situations stick out. We actually literally had to take physical property of the merchandise in our office in Scottsdale. So that's record ER 166. There was also a little colloquy about whether or not MARTA's pricing to its members was formulaic or not. Again, a hotly contested fact. We say it wasn't at all. Same witness. This is ER 168. Question, was there a formula that was used to determine what part would be passed along from MARTA to the members? Answer, well, if there was an administrative charges or central billing discounts that we were given, that would not have been passed along. But typically, any other discounts would have been passed along. I don't know if there's a specific formula, though I don't believe anything exists such as a specific formula. So again, they were making their own decisions on a case-by-case basis as to how they were going to use the discounts and how they were going to price varied products. Is there any significance to the fact that the articles of incorporation, that one set of articles of incorporation say that MARTA will make the sales to the shareholders of a wholesale nature and not engage in the retail sales? So, what I would say- I mean, you put that in your brief. We did. You advanced that. Council very aptly says, well, that's wonderful, but it doesn't have anything to do with the situation in front of us. What I would say is, if you look at the facts, I think MARTA is analogous to a wholesaler, and I think that that's why it's in our brief. However, I don't think labels matter here. I think what really matters is the actual economic facts of what MARTA was doing, who was paying for the product, who was financially responsible. I mean, listen, we'll admit that in those same cooperative plan, we're called a non-purchaser. The thing that worried me a little bit about that, it seems to me that you advanced that for a false premise. If, in fact, the articles have changed to the premise now, which is different, it's the one that they quote. That's why I put that directly in front of you. Yeah, no, it's not different at all. In fact, the facts are very, very consistent as far as how MARTA has operated with its members during the entire conspiracy period. I think the point of that is to say, if you're going to look at a distribution chain, who is MARTA like? They're not a distributor, but they're like a distributor. And if you also look in the testimony, when they were asked, who do you compete with? They say, we compete with distributors. Is there any record evidence about the passage of title to the products? I believe, I don't have it on hand, but I believe, yeah, I don't believe there is. I think the facts are, as my counsel stated, we purchase it, it gets shipped directly to the member, we are financially responsible for it. And we pay the defendant, and if we don't get paid, we don't get paid, so. Thank you, counsel. Thank you. It might be because title in a UCC situation is not necessarily so important, because we have assumption of risk. Thank you, the case just argued is submitted, and we appreciate the helpful arguments from both counsel in this very interesting case.
judges: Graber, N.R. Smith, Zipps